UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 19-10690-LTS |
| | ) | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) | |
| | ) | |
| Defendant. | ) | |

---

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 20, 25)

March 24, 2020

SOROKIN, J.

        This public records lawsuit concerns remarks given by two high-ranking U.S.

Immigration and Customs Enforcement ("ICE") officials at a 2019 conference held by the

National Sheriffs' Association ("NSA").  After the American Civil Liberties Union of

Massachusetts, Inc. ("ACLUM") filed two requests with ICE pursuant to the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, ICE disclosed almost wholly redacted copies of draft

talking points prepared in anticipation of the remarks, as well as heavily redacted copies of

related emails.  Additionally, ICE refused to disclose a draft agenda prepared by the NSA and in

ICE's possession.  ACLUM then filed this lawsuit, arguing that: (1) ICE erroneously asserted the

"deliberative process privilege" to justify its redactions to the draft talking points and related

emails; (2) ICE failed to conduct adequate searches in response to ACLUM's two FOIA

requests; and (3) ICE improperly withheld the draft agenda prepared by the NSA.  Now before

the Court are the parties' cross-motions for summary judgment.  Doc. Nos. 20, 25.  For the

following reasons, ACLUM's motion is ALLOWED IN PART and ICE's motion is ALLOWED IN PART and OTHERWISE DENIED.

I.   FACTS[1]

Beginning on February 9, 2019, the NSA held its 2019 Winter Legislative & Technology Conference in Washington, D.C.  Doc. No. 27 ¶ 1.  The next day, on February 10, 2019, the Bristol County Sheriff's Office posted a picture to its Twitter page of Matthew Albence, then ICE's Executive Associate Director for Enforcement and Removal Operations and Senior Official Performing the Duties of Deputy Director, Doc. No. 21-1 ¶ 33, speaking to NSA conference attendees.  Doc. No. 28-2 at 2.  Shortly thereafter, on February 22, 2019, ACLUM submitted a FOIA request to ICE ("the February Request"), seeking information about Mr. Albence's address to the conference attendees, including:

1.  Records containing some or all of the Address, including without limitation any prepared remarks, notes, talking points, and outlines, and any drafts thereof.

2.  Any slides, powerpoint presentations, and handouts presented or provided in connection with the Address, and any drafts thereof.

3.  Any audio and/or visual recordings of the Address.

4.  Correspondence, including email correspondence, between or among ICE personnel (including Mr. Albence and his staff) and representatives of the National Sheriff's Association concerning the planning, delivery, and/or content of the Address.

5.  Correspondence, including email correspondence, between or among ICE personnel (including Mr. Albence and his staff) and any employees or officers of the Commonwealth of Massachusetts (including any Massachusetts Sheriff and/or the employees of any Massachusetts Sheriff's Department) concerning the planning, delivery, and/or content of the Address.

---

[1] ICE did not respond to ACLUM's Statement of Material Undisputed Facts.  Doc. No. 27. Thus, the facts set forth therein "will be deemed for purposes of [this] motion to be admitted[.]" L.R. 56.1; Zimmerman v. Puccio, 613 F.3d 60, 63 (1st Cir. 2010).

Doc. No. 16-1.  On March 15, 2019, ICE sent an email invoking a 10-working-day extension to respond to ACLUM's February Request, pursuant to 5 U.S.C. § 552(a)(2)(6)(B).  Doc. No. 27 ¶ 7.  Upon expiration of that extension, ICE had not provided any other response to ACLUM's February Request, nor had it produced any of the records that ACLUM requested.  On April 10, 2019, ACLUM filed this lawsuit, seeking, inter alia, the production of responsive records to its February Request.  Id. ¶ 8.

On April 16, 2019, ICE produced 141 pages of records.  Id. ¶ 9.  This document production included a heavily redacted email chain between various ICE officials in which they discussed the creation of "draft remarks" for the NSA conference.  See Doc. No. 21-6 at 1-51.  Additionally, the document production included an entirely redacted draft agenda for the NSA conference that had been created by the NSA and later sent to ICE.  Id. at 89; Doc. No. 41-1 at 5 (supplemental affidavit of Toni Fuentes stating that the "draft agenda was provided to the agency by the [NSA] in advance of the meeting to assist in ICE's general preparation").  Finally, ICE's document production included three different versions of a document entitled "Draft Talking Points Prepared for ICE Acting Director Ronald D. Vitiello . . . February 11, 2019 9 AM."  See Doc. No. 21-6 at 39-44 (last-in-time version); id. at 74-85 (Version 1, drafted February 4, 2019); id. at 105-110 (Version 2, drafted February 6, 2019).  While the substance of each version of this document was entirely redacted, the title (which was unredacted) disclosed that then-Acting Director Vitiello gave an address at the NSA conference in addition to Mr. Albence's remarks.  Cf. Doc. No. 28-2 at 2 (reproducing Bristol County Sheriff's Office's February 10, 2019 tweet featuring a picture of Mr. Albence at the conference).

Given this revelation, ACLUM submitted an additional FOIA request to ICE on May 16, 2019 ("the May Request"), seeking information concerning Mr. Vitiello's remarks.  See Doc.

No. 27 ¶ 11 (mirroring language set forth in ACLUM's February Request).  ICE did not produce

any documents in response to ACLUM's May Request, nor did it conduct any additional search

in response to the May Request.  Id. ¶ 12.  On August 9, 2019, ACLUM filed an Amended

Complaint that added the May Request as an additional basis of relief.  Doc. No. 16.  On

September 11, 2019, ICE moved for summary judgment, arguing that it had conducted an

adequate search in response to ACLUM's FOIA requests and that its many redactions were

proper under Exemptions 5 (protecting "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party . . . in litigation with the agency" and thus

encompassing the "deliberative process privilege"), 6 (permitting the government to withhold

personnel and similar files the disclosure of which "would constitute a clearly unwarranted

invasion of privacy"), 7(C) (protecting law enforcement information that "could reasonably be

expected to constitute an unwarranted invasion of personal privacy"), and 7(E) (protecting law

enforcement information which "would disclose techniques and procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the

law.").  5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C), (b)(7)(E); Doc. No. 21 at 6.[2]

    In support of its motion, ICE included a Declaration from Toni Fuentes ("Fuentes

Declaration"), the Deputy Officer in ICE's FOIA Office.  Doc. No. 21-1 ¶ 1.  Among other

things, the Fuentes Declaration describes ICE's system for processing FOIA requests.  Doc. No.

21-1 ¶ 16.  According to Fuentes, "[o]nce the ICE FOIA Office determines the appropriate

program offices for a given [FOIA] request, it provides the [point of contact] ("POC") within

---

[2] ACLUM has only contested the agency's redactions pursuant to Exemption 5.  Doc. No. 26 at
2.

each of those program offices with a copy of the FOIA request and instructs them to conduct a search of responsive documents."  Id.  Then, POCs "forward the request and instructions to the individual employee(s) or component office(s) within the program office[s] that they believe are reasonably likely to have responsive records, if any."  Id.  Finally, "the individuals and component offices are directed to conduct searches of their file systems, including both paper files and electronic files[.]"  Id.

The Fuentes Declaration also describes the manner in which ICE employees and program offices maintain records.  Id. ¶ 17.  According to Fuentes, "ICE employees may store electronic records on their individual computer hard drives, their program office's shared drive (if the office uses one), DVDs, CDs, and/or USB storage devices."  Id.  Additionally, "ICE employees use various methods to store their Microsoft Outlook e-mail files," including monthly archives sorted by subject and storage on hard drives or shared drives.  Id. ¶ 18.  Ultimately, according to Fuentes, "[e]ach ICE employee stores his/her files in the way that works best for that particular employee."  Id.

Based on the individuals and subject matter identified in ACLUM's February Request, the ICE FOIA Office instructed the ICE Office of the Deputy Director, the ICE Office of Public Affairs ("OPA"), and the ICE Office of Enforcement and Removal Operations ("ERO") to conduct searches for responsive documents.  Id. ¶ 22.  As to the Office of the Deputy Director, the Fuentes Declaration states that "the Deputy Director's Chief of Staff was tasked with a search of potentially responsive records and utilized the search function to identify any potentially responsive email correspondence and records contained in shared folders."  Id. ¶ 25.  As to the OPA, the Fuentes Declaration acknowledges that a specific OPA writer was "responsible for preparing remarks in advance of the [NSA] meeting for both the Deputy

Director [Mr. Albence] and Director [Mr. Vitiello]." Id. ¶ 27.  The Fuentes Declaration later
clarifies:

> [I]t is ICE's standard practice to draft remarks or talking points based on the
> subject matter of the engagement and not the individual scheduled to speak . . .
> [S]pecific talking points are generally not separately drafted for Mr. Albence and
> Mr. Vitiello.  Instead, talking points are drafted that can be utilized by
> Mr. Albence, Mr. Vitiello, or any other speaker that may take [sic] need to appear
> if the scheduled ICE speaker is unavailable.

Id. ¶ 34.  Given this "standard practice," the OPA writer who was responsible for preparing the
draft remarks or talking points for the NSA conference, as well as the OPA Deputy Assistant
Director who was "directly responsible for reviewing and overseeing draft remarks prepared for
the Deputy Director and Director," were "tasked with a search for potentially responsive
records." Id. ¶ 27.  This search yielded "135 pages of potentially responsive records," following
which "OPA confirmed that they were not aware of any 'final' talking points for [the NSA
conference]," and "that the draft talking points could be used for both Mr. Albence and
Mr. Vitiello." Id. ¶ 29.[3]

The Fuentes Declaration additionally states that the ERO, which was also tasked by the
ICE FOIA Office with conducting a search for responsive documents, "exercise[d] discretion . . .
in choosing the specific search terms utilized to ascertain whether or not potentially responsive
documentation exist[ed]." Id. ¶ 31.  That search, according to Fuentes, yielded "no records
responsive to [ACLUM's February] request." Id. ¶ 32.

---

[3] ACLUM states, and ICE does not dispute, that neither Mr. Albence nor Mr. Vitiello were
"asked what [they] said during [their] address[es], whether [they] used any prepared text or
talking points, whether [they] used any slides, handouts, or PowerPoint presentations, whether
[their] remarks are memorialized anywhere, or whether [they have] in [their] possession any
responsive records." Id. ¶¶ 10, 13.

ICE's motion was also accompanied by a <u>Vaughn</u> index of its document production. Doc. No. 21-2; <u>Carpenter v. U.S. Dep't of Justice</u>, 470 F.3d 434, 442 (1st Cir. 2006) ("Generally, a <u>Vaughn</u> index provides a broad description of the requested material or information, and the agency's reason for withholding each document or portion of a document.").  In relevant part, the <u>Vaughn</u> index explains that "internal e-mail discussion[s] between ICE employees regarding draft remarks and preparation for the [NSA conference]" are properly redacted under FOIA Exemption 5 because "[t]he release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel resulting in a chilling effect on intra-agency communications."  Doc. No. 21-2 at 1-2.  ICE also cites these concerns to justify its complete redaction of the substance of the three "draft talking points" documents that it identified as responsive.  <u>Id.</u> at 3, 7, 10.  However, ICE does not dispute that "[t]he remarks prepared by the OPA writer . . . are not related to any policy development and policy decision processes, or any not-yet-finalized policy decision."  Doc. No. 27 ¶ 19.  Finally, ICE states that it applied Exemption 5 to "a draft agenda for the [NSA] meeting held on Monday, February 11, 2019" because it "contains non-final information and itineraries for ICE's speaking engagements for the meeting."  <u>Id.</u> at 9.

In response, ACLUM cross-moved for summary judgment.  Doc. No. 25.  In its motion, ACLUM challenged only ICE's Exemption 5 redactions.  Specifically, ACLUM asked the Court to address five questions:

1. Whether the last-in-time version of the prepared remarks is post-decisional, and therefore outside the scope of the deliberative process privilege;

2. Whether the deliberative process privilege protects these prepared remarks at all, when they are not related to any policy-making process;

3. Whether ICE failed to produce segregable factual information from the prepared remarks and related emails;

4. Whether ICE failed to conduct adequate searches in response to the relevant FOIA requests; and

5. Whether ICE improperly withheld a document prepared by a third party on deliberative process grounds.

Doc. No. 26 at 2. ICE opposed the cross-motion, reiterating its positions that: (1) its redactions were proper under Exemption 5; (2) none of the withheld material contains segregable factual information; (3) ICE conducted an adequate search for responsive documents; and (4) the draft agenda created by the NSA and given to ICE was properly withheld under Exemption 5. Doc. No. 41.

## II.   LEGAL STANDARD

When Congress enacted FOIA, it codified into law "a general philosophy of full agency disclosure.'" U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989) (quoting S. Rep. No. 813, 89th Cong., 2nd Sess., 3 (1965)). It did so because "Congress believed that this philosophy, put into practice, would help 'ensure an informed citizenry, vital to the functioning of a democratic society.'" Id. (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978)). FOIA "was intended to expose the operations of federal agencies 'to the light of public scrutiny.'" Carpenter, 470 F.3d at 437 (quoting Dep't of the Air Force v. Rose, 425 U.S. 352, 372 (1976)); see also Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 172 (2004) (holding that FOIA "defines a structural necessity in a real democracy."). "The policy underlying FOIA is one of broad disclosure, and the government must supply any information requested by any individual unless it determines that a specific exemption, narrowly construed, applies.'" Church of Scientology Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 228 (1st Cir. 1994).

"FOIA cases are typically decided on motions for summary judgment." Am. Civil Liberties Union Found., Inc. v. United States Dep't of Educ., 320 F. Supp. 3d 270, 276 (D. Mass.

2018).  Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v.

Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to [] view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986). When cross-motions for summary judgment are presented, the

Court "must consider each motion separately" and draw all inferences against each moving party

in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

III.     DISCUSSION

         The Court first considers whether FOIA Exemption 5's "deliberative process privilege"

applies to (1) any of the three versions of draft remarks or talking points created by the OPA in

preparation for Mr. Vitiello's and Mr. Albence's remarks at the NSA conference, or (2) the email

communications between ICE staff members discussing the draft talking points.  Then, the Court

considers whether ICE has met its burden to demonstrate that it conducted an adequate search for

documents responsive to ACLUM's two FOIA requests.  Finally, the Court takes up whether a draft agenda created by the NSA and provided to ICE was properly withheld under Exemption 5. As to each issue, the Court will first consider ACLUM's cross-motion for summary judgment and then turn to ICE's motion for summary judgment.

A.   Exemption 5 is Inapplicable to the Draft Talking Points and Emails

ICE justifies its almost complete redaction of the three versions of the draft talking points, as well as its partial redaction of email communications discussing those draft talking points, by asserting the applicability of Exemption 5.  ACLUM, for its part, argues that ICE has not met its burden to demonstrate that Exemption 5 shields the disputed material from disclosure.

"FOIA provides that certain categories of materials are exempted from the general requirements of disclosure," but these exemptions "are to be construed narrowly, with any doubts resolved in favor of disclosure." Carpenter, 470 F.3d at 438; Moffat v. DOJ, 716 F.3d 244, 250 (1st Cir. 2013).  "The government bears the burden of proving that withheld materials fall within one of the statutory exemptions, and district courts are required to make de novo determinations as to the validity of the asserted exemptions." Id. (citing 5 U.S.C. § 552(a)(4)(B)) (additional citations omitted).  "This burden does not shift even when," as here, "the requester files a cross-motion for summary judgment." Prop. of the People, Inc. v. Office of Mgmt. & Budget, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (internal quotation marks omitted).  Thus, it is the government's burden to provide "a reasonably detailed explanation for its withholdings" that "'afford[s] the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding.'" Church of Scientology, 30 F.3d at 231, 233 (quoting Wiener v. F.B.I., 943 F.2d 972, 977 (9th Cir. 1991)).

Under 5 U.S.C. § 552(b)(5), "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency" are exempted from disclosure.  The First Circuit has held that Exemption 5 "facilitates government decision making by: (1) assuring subordinates will feel free to provide uninhibited opinions, (2) protecting against premature disclosure of proposed government policies, and (3) preventing confusion among the public that may result from releasing various rationales for agency action." New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs., 778 F.3d 43, 52 (1st Cir. 2015).

"To invoke the Exemption 5 deliberative process privilege, [ICE] must prove that the documents at issue 'were both predecisional and deliberative.'" Am. Civil Liberties Union Found., Inc., 320 F. Supp. 3d at 277 (quoting N.H. Right to Life, 778 F.3d at 52) (internal quotation marks omitted). "A document is predecisional if the agency can: '(1) pinpoint the specific agency decision to which the document correlates, (2) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (3) verify that the document precedes, in temporal sequence, the decision to which it relates.'" N.H. Right to Life, 778 F.3d at 52–53 (quoting Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d 552, 557 (1st Cir. 1992)).  "A predecisional document will qualify as 'deliberative' provided it (i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'" Providence Journal, 981 F.2d at 559 (quoting Nat'l Wildlife Fed'n v. U.S. Forest Serv., 861 F.2d 1114, 1118–19 (9th Cir. 1988)).

1.      These Draft Talking Points Are Not Deliberative

ICE contends that the deliberative process privilege shields the three versions of the draft talking points, Doc. No. 21-6 at 39-44 (last-in-time version); id. at 74-85 (Version 1, drafted February 4, 2019); id. at 105-110 (Version 2, drafted February 6, 2019), arguing that these documents are both "predecisional" and "deliberative" in nature.  However, as ACLUM argues, even predecisional documents "may still not fall within the confines of [the deliberative process privilege] if [they] are not part of the deliberative process."  Providence Journal, 981 F.2d at 559. Here, ICE is unable to meet its burden to demonstrate that Exemption 5 shields the release of any of the three versions of the draft talking points because it has not provided any evidence, as it must, that those documents are "deliberative."

The First Circuit has held that records concerning "how and what to communicate to the public" may fall within the deliberative process privilege.  N.H. Right to Life, 778 F.3d at 54. For example, courts have routinely held that "'messaging' communication[s] can be protected by the deliberative process privilege," New York v. United States Dep't of Commerce, No. 18-CV-2921 (JMF), 2018 WL 4853891, at *2 (S.D.N.Y. Oct. 5, 2018), so long as they "reflect[] the give-and-take of the consultative process" and were "prepared to facilitate and inform a final decision or deliberative function entrusted to the agency."  Providence Journal Co., 981 F.2d at 559-60.  They have also held, however, that "where 'messaging' communications amount to little more than deliberations over how to spin a prior decision, or merely reflect an effort to ensure that an agency's statement is consistent with its prior decision, protection would do little to advance the purposes underlying the privilege."  New York, 2018 WL 4853891, at *2.  Thus,

for courts determining whether the deliberative process privilege applies to a specific set of messaging communications, the central inquiry is

> whether the disputed materials reflect deliberations about what message should be delivered to the public about an already-decided policy decision, or whether the communications are of a nature that they would reveal the deliberative process underlying a not-yet-finalized policy decision, including the very decision about what message to deliver—provided that the particular messaging decision is among those that Congress has asked the agency to make.

Id. (internal quotation marks omitted).

Here, ICE has proffered no evidence that any of the three versions of the draft talking points involve not-yet-finalized policy decisions or were otherwise bound up with policy matters. Indeed, the undisputed facts establish that "[t]he remarks prepared by the OPA writer . . . are not related to any policy development and policy decision processes, or any not-yet-finalized policy decision."  Doc. No. 27 ¶ 19.  To the extent that ICE has explained its basis for invoking Exemption 5 to redact these documents, the agency has merely relied on conclusory statements averring that the documents contain "opinions, conclusions, and recommendations," asserting that "[t]he release of [the draft talking points] would discourage the expression of candid opinions . . . resulting in a chilling effect on intra-agency communications[.]"  Doc. No. 21-2 at 7 (describing the basis for withholding Version 1 of the draft talking points); cf. Sensor Sys. Support, Inc. v. F.A.A., 851 F. Supp. 2d 321, 331 (D.N.H. 2012) ("If [ICE's] conclusory position were sufficient to invoke the privilege, the exemption would effectively swallow the FOIA's rule of broad disclosure").  Wholly absent from this explanation is any evidence tending to show that the draft talking points were "anything more than an explanation of existing [ICE] policies and decisions."  Doc. No. 26 at 11.  ICE has given the Court "no basis to conclude that [it] was exercising its essential policymaking role" when the OPA created various versions of the draft talking points.  New York, 2018 WL 4853891, at *3.  Without a showing that the OPA's process

of creating the draft talking points was "intimately bound up with [the] agency's central policy mission," id. at *2, ICE cannot carry its burden to demonstrate that Exemption 5 justifies its redactions.  Cf. Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency, No. 17-CV-5928 (JMF), 2019 WL 4142725, at *9 (S.D.N.Y. Aug. 30, 2019), reconsideration denied sub nom. Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency, No. 17-CV-5928 (JMF), 2019 WL 6467497 (S.D.N.Y. Dec. 2, 2019) (holding that "draft talking points" about "how to present [a preexisting] EPA program" and "how to respond to the potential questions on . . . a pesticide then under review by the EPA . . . if it should come up during [a] press conference" were not deliberative and thus subject to disclosure).

While FOIA does not require ICE "to operate in a fishbowl" when crafting all talking points for all public statements made by its officials, Wolfe v. Dep't of Health & Human Servs., 839 F.2d 768, 773 (D.C. Cir. 1988), the deliberative process privilege does not shield all talking points, all "draft" talking points, or all prepared public remarks, even when not delivered verbatim.  See New York Times Co. v. U.S. Dep't of Def., 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007) (holding that "[t]he mere fact that a document is a draft . . . is not a sufficient reason to automatically exempt it from disclosure." (quoting Lee v. FDIC, 923 F. Supp. 451, 458 (S.D.N.Y. 1996)); Judicial Watch, 349 F. Supp. 3d at 8 (holding that press guidance talking points were not deliberative); cf. Stalcup v. C.I.A., 768 F.3d 65, 71 (1st Cir. 2014) (holding that a document labeled "draft" was properly withheld as a deliberative document because it was, inter alia, "passed on to agency management for possible policy changes").[4]

---

[4] Indeed, ICE's reliance on New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs., 778 F.3d 43 (1st Cir. 2015) is misplaced.  In New Hampshire Right to Life, the First Circuit merely held that multiple drafts for a public statement announcing the Department of Health and Human Service's intent to issue a grant were "pre-decisional"; it did not address whether such documents were "deliberative."  N.H. Right to Life, 778 F.3d at 52 ("Right to Life

Put another way, ICE has not made the showing required under the three-part inquiry of Providence Journal Co. v. U.S. Department of Army, 981 F.2d 552, 559 (1st Cir. 1992) (describing the characteristics of "deliberative" documents).  First, ICE has not demonstrated that the draft talking points "form[ed] an essential link in a specified consultative process," id. at 559, because there is no evidence that the draft talking points played any part in a "deliberative function entrusted to the agency," such as developing policy.  Cf. Am. Civil Liberties Union Foundation, Inc., 320 F. Supp. 3d at 279 (holding that "emails pertaining to the development of [a] Frequently Asked Questions [document]" formed an essential link a specified consultative process because they were "part of the [agency's] process of creating future [] policies").  Second, there is nothing in the record— aside from conclusory statements in ICE's Vaughn index and affidavits—tending to show that the draft talking points contain the personal opinions of the OPA writer who was responsible for their drafting.  In fact, it is undisputed that the draft talking points were created as a resource for "any [ICE] speaker that may need to appear" at the NSA conference and present on behalf of the agency.  Doc. No. 41-1 at 4.  Third, ICE has not met its burden to demonstrate that the draft talking points, "if released, would inaccurately reflect or prematurely disclose the views of the agency."  Providence Journal, 981 F.2d at 559.  Indeed,

---

argues that the documents are not deliberative only because they are not predecisional, so we limit our inquiry to whether they are indeed predecisional.").  In any event, the documents at issue in New Hampshire Right to Life—email communications between agency staff concerning how to announce a policy decision that had not been previously disclosed to the public—were "intimately bound up with [the] agency's central policy mission," New York, 2018 WL 4853891, at *2, and "facilitat[ed] and inform[ed] . . . a deliberative function entrusted to the agency," Providence Journal, 981 F.2d at 560.  Here, ICE has proffered no evidence demonstrating that these draft talking points were created as a part of a similar agency process.  For the same reasons, the various cases cited by ICE, Doc. No. 41 at 3-4, are inapposite.  See also Judicial Watch, 349 F. Supp. 3d at 7-8, 11 (distinguishing cases cited in ICE's memoranda and holding that a "press guidance" document was neither "predecisional nor deliberative" because it "relay[ed] not a tentative plan but an already settled strategy").

ICE has repeatedly stated that it "did not record [Mr. Albence's or Mr. Vitiello's remarks at the] event in any manner, including either visually or audibly." Doc. No. 21-1 ¶ 35. Thus, to the extent that ICE has withheld these draft talking points in order to "avoid confusion of the public" due to potentially conflicting, inaccurate, or prematurely released agency statements, Doc. No. 21 at 8, disclosure of the draft talking points here will pose no such concern.

Accordingly, ICE has not met its burden of proving the applicability of Exemption 5 to any of the three versions of the draft talking points, Doc. No. 21-6 at 39-44 (last-in-time version); id. at 74-85 (Version 1, drafted February 4, 2019); id. at 105-110 (Version 2, drafted February 6, 2019). ICE shall disclose all three versions of the draft talking points.

2.      The Last-In-Time Version of the Draft Talking Points is Not Predecisional

Moreover, even if the draft talking points were deliberative documents—which ICE has not demonstrated—ICE has failed, for an additional reason, to meet its burden with respect to the last-in-time version of the draft talking points, Doc. No. 21-6 at 39-44: ICE has not shown it to be a predecisional document. In support of its invocation of Exemption 5 to shield the last-in-time version of the draft talking points, ICE contends: "By their very nature, draft documents [like the last-in-time version of the draft talking points] are pre-decisional, preliminary versions of what may later become a final document . . . [or] may never mature into final form as the material may be withdrawn or discarded[.]" Doc. No. 21-1 ¶ 39. ICE argues that the draft talking points, which were created by an OPA writer and reviewed by the OPA Deputy Assistant Director, "never became final, as [Mr. Albence and Mr. Vitiello] could use or not use the talking points as [they] [] desired." Doc. No. 21 at 10. Contrary to ICE's assertions, however, this does not establish that the last-in-time version of the draft talking points is a predecisional document.

First, ICE has not, as is its burden, "pinpoint[ed] the specific agency decision to which the [last-in-time version of the draft talking points] correlates" or "verif[ied] that the [last-in-time version of the draft talking points] precedes, in temporal sequence, the decision to which it relates." Providence Journal, 981 F.2d at 557.  In fact, according to the Fuentes Declaration, the OPA was tasked with creating the draft talking points as a resource that could be "utilized by Mr. Albence, Mr. Vitiello, or any other speaker that may [] need to appear if the scheduled ICE speaker [was] unavailable."  Doc. No. 21-1 ⁋ 34.  Thus, rather than correlating to or preceding another decision, the last-in-time version of the draft talking points is itself post-decisional; the relevant agency decision—determining the subject matter and substance of the talking points that ICE officials could reference when presenting to the NSA conference attendees—was resolved when the OPA finished its drafting and editing process.  These talking points, then, were the agency's final word on how ICE officials—not just the Acting Director or Deputy Director— should address the NSA conference attendees.

Second, ICE has not established that the draft talking points were created "for the purpose of assisting the agency official charged with making the agency decision[.]"  Providence Journal, 981 F.2d at 557.  As detailed above, the Fuentes Declaration makes clear that it was "an OPA writer" who was "responsible for preparing remarks in advance of the [NSA] meeting for both the Deputy Director and Director[.]"  Doc. No. 21-1 ⁋ 27 (emphasis added).  Rather than demonstrating that the OPA writer was "assisting" some other ICE official's decision, the Fuentes Declaration, on its face, establishes that the OPA writer was charged with decision- making authority.

Similarly, ICE's claim that the OPA-created talking points "never became final," Doc. No. 21 at 10, cannot help the agency meet its burden.  It is of no moment that Mr. Albence or

Mr. Vitiello could have deviated from the last-in-time version of the draft talking points during their respective NSA conference presentations.  Whether or not the last-in-time version of the draft talking points was read verbatim, loosely paraphrased, or entirely disregarded, that document remains the final product of an agency decision-making process.  As other courts have held, "[e]xtending [ICE's reasoning] to its logical limits means any prepared remarks—even the State of the Union—could be withheld under the deliberative process privilege, since a speaker could always go off-script, extemporally exposing the final stage of a deliberative process."  Judicial Watch, Inc., 349 F. Supp. 3d at 7.  This Court concurs that the predecisional element of the deliberative process privilege inquiry may not be "stretched," as ICE urges, to encompass finalized agency documents like the last-in-time version of the talking points.  Id.  Thus, ICE has not, for this additional reason, met its burden of proving the applicability of Exemption 5 to the last-in-time version of the draft talking points, Doc. No. 21-6 at 39-44.

Accordingly, ACLUM's cross-motion as to the last-in-time version of the draft talking points is ALLOWED and ICE's motion for summary judgment as to those redactions is necessarily DENIED.  For the foregoing additional reason, ICE shall disclose the last-in-time version of the draft talking points.

### 3.     Emails About the Draft Talking Points

Next, ICE asserts that the deliberative process privilege shields portions of "internal e-mail discussion between ICE employees regarding draft remarks and preparation for the [NSA] Immigration and Border Security Meeting."  Doc. No. 21-2 at 2 (describing emails reproduced at Doc. No. 21-6 at 1, 11, 12, 13, 14, 15, 19, 22, 26, 29, 32).  However, the agency has not met its burden to demonstrate that the emails are deliberative.  See Providence Journal, 981 F.2d at 559 (describing the characteristics of "deliberative" documents).

In its <u>Vaughn</u> index, the agency avers that portions of the emails may be withheld because disclosure would "discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel resulting in a chilling effect on intra-agency communications."  Doc. No. 21-2 at 2.  However, just as with the draft talking points, <u>see supra</u> section III.A.1, these assertions are insufficient to demonstrate that the email communications "facilitate[ed] and inform[ed] . . . a deliberative function entrusted to the agency," <u>Providence Journal</u>, 981 F.2d at 560, and were "intimately bound up with [the] agency's central policy mission," <u>New York</u>, 2018 WL 4853891, at *2.  Moreover, ICE's statements about the emails "do not clearly indicate that the emails 'formed an essential link'" in a specified consultative process, "nor do they state that the emails reflect the writers' personal opinions." <u>Am. Civil Liberties Union Found., Inc.</u>, 320 F. Supp. 3d at 280.  Similarly, the justification offered in ICE's <u>Vaughn</u> index, Doc. No. 21-2 at 2, and mirrored in the Fuentes Declaration, Doc. No. 21-1 ₱ 39, provides no evidence that the redacted portions of the emails inaccurately reflect the views of the agency or would prematurely disclose agency policy positions or other agency views.

Accordingly, ACLUM's cross-motion as to the portions of the email communications that were redacted pursuant to Exemption 5 is ALLOWED and ICE's motion for summary judgment is necessarily DENIED.  ICE shall disclose the portions of the emails that were previously redacted pursuant to Exemption 5.[5]

---

[5] ACLUM argues, in the alternative, that factually-segregable information contained within the emails must be disclosed irrespective of whether Exemption 5 generally applies and that the Court should conduct an <u>in camera</u> review of the emails to determine whether they contain such segregable information.  <u>See</u> Doc. No. 26 at 13-14.  As the Court has determined that ICE has not met its burden to establish that the relevant portions of the emails were properly withheld under Exemption 5, the parties' cross-motions as to whether ICE must disclose factually-segregable information contained in the emails, as well as the parties' cross-motions regarding

B.    ICE Has Not Demonstrated That It Conducted an Adequate Search

In addition to challenging the applicability of Exemption 5 to various documents wholly or partially withheld by ICE, ACLUM contends that the agency failed to conduct an adequate search for responsive records.  Doc. No. 26 at 14-15.

The burden at summary judgment "rests with the agency subject to a FOIA request to establish that it has 'made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'"  Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990)).  "This showing may be made by affidavits, 'provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith.'"  Stalcup v. Dep't of Def., No. 13-11967-LTS, 2015 WL 5545059, at *3 (D. Mass. Sept. 18, 2015) (quoting Maynard v. C.I.A., 986 F.2d 547, 559 (1st Cir. 1993)).

An adequate affidavit will "describe in reasonable detail the scope and method by which the search was conducted" and "describe at least generally the structure of the agency's file system which makes further search difficult."  Id. at 559-60 (citations omitted).  Further, an adequate affidavit may "set [] forth the search terms and the type of search performed, and aver [] that all files likely to contain responsive materials . . . were searched."  Oleskey, 658 F. Supp. 2d at 294 (quoting Iturralde v. Comptroller of Currency, 315 F.3d 311, 313-314 (D.C. Cir. 2003)).  If the agency makes a sufficient showing, "a rebuttable presumption that the agency

---

the propriety of an in camera review of the emails, are DENIED AS MOOT.  The Court notes that ACLUM did not object to any of ICE's redactions justified pursuant to Exemptions 6, 7(C), and 7(E).  Accordingly, ICE's motion for summary judgment as to the portions of the emails redacted pursuant to those Exemptions, Doc. No. 21 at 11-14, is ALLOWED.  Those portions need not be disclosed.

acted in good faith emerges." Stalcup v. C.I.A., 768 F.3d 65, 74 (1st Cir. 2014).  A requester can rebut that presumption and avoid summary judgment only "by showing that the agency's search was not made in good faith." Maynard, 986 F.2d at 560.

If the agency does not supply sufficient evidentiary support for its search, then the requester may avoid summary judgment "merely by showing that the agency might have discovered a responsive document had the agency conducted a reasonable search." Id. Critically, however, in assessing the adequacy of a search, "[t]he crucial issue is not whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'" Id. at 559 (quoting Safecard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1201 (D.C. Cir. 1991)).

Here, ACLUM argues that ICE has failed, in two respects, to meet its burden to demonstrate that it performed an adequate search.  First, ACLUM contends that ICE's failure to conduct any additional search for responsive documents after the agency received ACLUM's May Request, see Doc. No. 27 ⁋ 12; Doc. No. 21-1 ⁋ 8 (stating that the agency's "final response letter" was sent on April 16, 2019), renders ICE's search inadequate.  Second, ACLUM argues that ICE cannot meet its burden because it never contacted Mr. Albence or Mr. Vitiello to determine "what they said, what documents they relied upon or distributed [at the NSA conference], or whether they have retained any records in their possession."  Doc. No. 26 at 15. ICE, for its part, claims that "there are simply no additional records or locations that could have been searched" and that it need not "question Mr. Albence and Mr. Vitiello directly" to comply with FOIA's requirements.  Doc. No. 41-1 ⁋ 9.

In this case, ICE's affidavits, while detailed in some respects, are insufficient to establish that the agency "made a good faith effort to conduct a search for the requested records."  Oleskey

ex rel. Boumediene, 658 F. Supp. 2d at 294.  First, there is a disconnect between ICE's description of its employees' data storage practices and its account of the search procedure that program office POCs undertook in response to ACLUM's February Request.  For example, the Fuentes Declaration states that "ICE employees may store electronic records on their individual computer hard drives, their program office's shared drive (if the office uses one), DVDs, CDs, and/or USB storage devices,"  Doc. No. 21-1 ¶ 17;  that "ICE employees use various methods to store their Microsoft Outlook e-mail files," including monthly archives sorted by subject and storage on hard drives or shared drives,  id. ¶ 18; and that "[e]ach ICE employee stores his/her files in the way that works best for that particular employee," id.  By contrast, the declaration states only that the Deputy Director's Chief of Staff "utilized the search function to identify any potentially responsive e-mail correspondence and records contained in shared folders."  Id. ¶ 25. This explanation fails to address where the Deputy Director is likely to store responsive documents, like "notes" or "outlines" for a speaking engagement, see Doc. No. 16-1 (the February Request); or why the Deputy Director's Chief of Staff did not search the Deputy Director's individual computer hard drive, which the Fuentes Declaration describes as a primary data storage location.  Id. ¶ 17.  Similarly, ICE's explanation of the search undertaken by the POC in the ERO Information Disclosure Unit does not identify the search terms that the POC utilized or explain why the search was limited to "records contained in shared folders." Doc. No. 21-1 ¶ 32.  In short, other than the assertion that ICE "appropriately tasked every program office that was reasonably likely to have responsive records," Doc. No. 41-1 at 5, a conclusory representation, the affidavits do not provide a basis for the Court to conclude that ICE reasonably identified and searched all appropriate electronic locations.

Second, ICE's affidavits fail to adequately explain the agency's failure to conduct <u>any</u> additional search in response to ACLUM's May Request.  Doc. No. 27 ¶ 11 (seeking records related to Mr. Vitiello's remarks at the NSA conference).  Contrary to ICE's assertion, the mere fact that "specific talking points are generally not separately drafted for Mr. Albence and Mr. Vitiello," Doc. No. 21-1 ¶ 34, does not, in and of itself, render separate searches of the Office of the Acting Director and Mr. Vitiello's data storage locations duplicative.  Cf. <u>Stalcup</u>, 2018 WL 4963169, at *5 (holding that a "description of the agency's search provided in [an] affidavit [did] not cogently explain [the agency's] decision to search only one Directorate.") (internal quotation marks omitted).  ACLUM's May Request clearly sought "[r]ecords containing some or all of the Address, including without limitation any prepared remarks, notes, talking points, and outlines . . . thereof."  Doc. No. 27 ¶ 11.  This request was not limited to "draft remarks or talking points," as ICE states, Doc. No 21-1 ¶ 34, and ICE's conclusory representation that its Front Office is "unaware of other versions" of the "draft remarks," <u>id.</u> ¶ 35, does not cogently explain why a targeted search for responsive documents—such as "notes" and "outlines"—in data storage locations utilized by Mr. Vitiello and his office is unnecessary to comply with FOIA's demands.  For example, neither affidavit submitted by ICE explains why a POC in the Acting Director's office was not tasked with searching Mr. Vitiello's electronic records, including any data that was housed on his individual computer hard drive before his resignation, as well as the Office of the Acting Director's shared drive, if it uses one.

Given that "the affidavits before the Court do not contain information sufficient to demonstrate that [ICE] undertook a good-faith effort to design a search" of the Offices of the Deputy Director, ERO, and Acting Director that "was reasonably calculated to return all documents responsive to [ACLUM]'s request[s], the agency has not met its 'initial burden of

showing that it conducted an adequate search.'" Stalcup, 2018 WL 4963169, at *6 (quoting

Moffat, 716 F.3d at 254). Accordingly, ACLUM's cross-motion for summary judgment as it

relates to the adequacy of ICE's search for responsive documents is ALLOWED and ICE's

motion for summary judgment is DENIED.

The Court declines, on this record, to require ICE to directly contact Mr. Albence and

Mr. Vitiello, as direct inquiries may not be necessary for ICE to discharge its FOIA obligations.

However, ACLUM may, within sixty days, take limited focused discovery, including depositions

of POCs who were tasked with conducting searches in the relevant ICE program offices, in order

to develop the record necessary to determine whether ICE's search procedures were reasonably

calculated to return all documents responsive to ACLUM's two FOIA requests. Cf. El Badrawi

v. DHS, 583 F. Supp. 2d 285, 299-301 (D. Conn. 2008) (permitting limited discovery where

agency did not explain why it chose to search only one database and not others); Long v. DOJ,

10 F. Supp. 2d 205, 210 (N.D.N.Y. 1998) (finding discovery appropriate to test adequacy of

search); Pub. Citizen Health Research Grp. v. FDA, 997 F. Supp. 56, 72 (D.D.C. 1998) (holding

that discovery would be limited to "investigating the scope of the agency search for responsive

documents, the agency's indexing procedures, and the like"), rev'd, in part, on other grounds,

185 F.3d 898 (D.C. Cir. 1999).[6] Within seven days after the completion of this discovery period,

the parties shall file a joint status report setting forth their joint or separate positions as to the

resolution of this dispute. Absent further order of the Court, thirty days after the completion of

this further period of discovery, ICE shall file a renewed motion for summary judgment on the

---

[6] The Court declines, now, to order specific further searches. While the present record plainly
falls short of establishing that ICE conducted reasonable searches as the law required it to do, the
record is insufficient to permit the Court to dictate the proper search to be conducted.

reasonableness of the search with an opposition/cross-motion due thirty days thereafter, followed by a reply in fourteen days, and a surreply fourteen days thereafter.

C.       Exemption 5 is Inapplicable to the Draft Agenda

Finally, ACLUM argues that ICE improperly invoked Exemption 5 to withhold a draft conference agenda that was, according to ICE, "provided to the agency by the [NSA] in advance of the [NSA conference] to assist in ICE's general preparation."  Doc. No. 41-1 ⁋ 10.  ICE contends, however, that this document was properly withheld because it "contains non-final information and itineraries for ICE's speaking engagements for the [NSA conference] meeting."  Doc. No. 21-2 at 3.[7]

By its plain terms, Exemption 5 shields certain "inter-agency or intra-agency memorandums or letters" from disclosure.  5 U.S.C. § 552(b)(5).  The statute further clarifies that the term "agency" refers to executive branch government authorities, including "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the Executive Branch of the Government . . . or any independent regulatory agency."  5 U.S.C. § 552(f)(1).  It stands to reason, then, that an intra-agency document is one that was created within the halls of one of the statutorily enumerated government entities.  See Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (holding that "[t]o qualify [for Exemption 5's protection], a document['s] . . . source must be a Government agency").  Plainly, the NSA is not one of the statutorily enumerated government entities.  ICE makes no colorable or non-frivolous argument that the NSA so qualifies.

---

[7] Understandably, ICE did not invoke Exemption 4, which shields "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  N.H. Right to Life, 778 F.3d at 49 (quoting 5 U.S.C. § 552(b)(4)).

Some United States Courts of Appeals have recognized a narrow exception to this general rule for "communications between Government agencies and outside consultants hired by them." Id. at 9-10 (collecting cases).  ICE has not advanced this ground; thus, it is waived.  In any event, this possible exception has no application to this case.  ICE has proffered no evidence tending to show that the NSA was retained by ICE as a consultant, let alone as a consultant that "does not represent an interest of its own, or the interest of any other client." Id. at 11; cf. About NSA, https://www.sheriffs.org/about-nsa (last visited March 24, 2020) (describing the NSA as "a professional association" that "represents thousands of sheriffs, deputies and other law enforcement, public safety professionals, and concerned citizens nationwide.").

In short, there is no colorable argument to support invocation of Exemption 5 to protect a document created by a non-federal entity not serving as a paid consultant to the agency and not otherwise protected by another FOIA exemption.  Indeed, ICE's memoranda in support of its motion cite no legal authority for its remarkable proposition that a draft document created by a third-party organization and provided to an agency may generally be withheld from disclosure under Exemption 5.  See, e.g., Doc. No. 41 at 8.  In these circumstances, ICE cannot, as a matter of law, meet its burden to demonstrate that Exemption 5 was properly invoked to shield the draft agenda.

Accordingly, ACLUM's cross-motion is ALLOWED as to the draft agenda, Doc. No. 21-6 at 38, and ICE's motion for summary judgment is necessarily DENIED.  ICE shall disclose the draft agenda.

IV.    CONCLUSION

For the foregoing reasons, ACLUM's cross-motion for summary judgment (Doc. No. 25) is ALLOWED IN PART and ICE's motion for summary judgment (Doc. No. 20) is ALLOWED

IN PART and OTHERWISE DENIED.  Within twenty-one days,[8] ICE shall, consistent with this

Order, disclose:

- The last-in-time version of the draft talking points, Doc. No. 21-6 at 39-44;

- The two earlier versions of the draft talking points, id. at 74-85 (Version 1, drafted

  February 4, 2019); id. at 105-110 (Version 2, drafted February 6, 2019);

- The portions of the relevant email communications previously withheld under Exemption

  5, id. at 1, 11, 12, 13, 14, 15, 19, 22, 26, 29, 32;

- The draft agenda, id. at 38.

During the next sixty days, ACLUM may conduct limited focused discovery regarding the

reasonableness of the searches performed by ICE.  Within seven days after the completion of this

discovery period, the parties shall file a joint status report setting forth their joint or separate

positions as to the resolution of this dispute.  Absent further order of the Court, thirty days after

the completion of this further period of discovery, ICE shall file a renewed motion for summary

judgment on the reasonableness of the search with an opposition/cross-motion due thirty days

thereafter, followed by a reply in fourteen days, and a surreply fourteen days thereafter.


SO ORDERED.


  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[8]  In establishing this deadline, the Court has considered the ongoing coronavirus pandemic as
well as the important public interests served by FOIA.  The Court understands that the
documents ICE must disclose are all in electronic form; therefore, the entire disclosure process
can occur electronically while counsel work from home.  Of course, nothing in this Order
precludes a request for a reasonable extension related to the coronavirus pandemic or for any
other proper reason.